UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 229 PEARL ST., APT. C, ESSEX JUNCTION, VT | Case No. 2:23-MJ-7 |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Philip Tremblay, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I submit this affidavit in support of finding probable cause to search 229 Pearl Street, Apt. C, Essex Junction, Vermont ("Subject Premises"). The Subject Premises is described with greater particularity in Attachment A, attached hereto and incorporated herein. The applied-for warrant would authorize the search of the Subject Premises for the evidence of criminal violations, contraband and fruits of crime, and property designed for use in a crime as further described in Attachment B, attached hereto and incorporated herein.

2.  I am currently a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). I was deputized as a federal TFO pursuant to 21 U.S.C. § 878 on November 30, 2020, and I am designated by the Attorney General, through approved delegations of authority, to execute and serve search warrants and arrest warrants issued under the authority of the United States. Accordingly, I am serving as a "federal law enforcement officer" as defined in Federal Rule of Criminal Procedure 41(a)(2)(C). Prior to working as a full-time DEA TFO, I was assigned as a Detective at the Burlington, Vermont Police Department (BPD) since June of 2017. I have been a certified full-time law enforcement officer with BPD since May of 2012.

1

3. Throughout my assignments, I have investigated or assisted with the investigation of numerous drugs, drug related devices/paraphernalia and drug related evidence. I have seized or participated in seizures of different quantities of illegal drugs, controlled substances, user paraphernalia and other assorted items, such as money and property related to or acquired through the drug trade. I have seized or participated in seizures of various types of illegal drugs/narcotics during these investigations, to include powder cocaine, crack cocaine, marijuana, heroin, fentanyl, and numerous types of prescription medications. I have conducted or been involved in multiple drug investigations, and from this experience, I am familiar with the trends associated with the use and distribution of illegal drugs/controlled substances. I have conducted multiple controlled purchases of illegal substances both in an undercover capacity and utilizing a confidential source. I have also participated in specialized training in which the primary focus was proactive criminal drug enforcement provided by the Vermont Criminal Justice Training Council. This training taught me interdiction techniques and to identify criminal drug activities. I have successfully attended and completed the 80-hour, U.S. Department of Justice, Drug Enforcement Administration (DEA) Basic Narcotics School, as well the 32-hour U.S. Department of Justice Federal Bureau of Investigations ("FBI") Law Enforcement HUMINT Training Course.

4. I have participated in numerous state and federal investigations into different types of controlled substances and am familiar with the use of cellular telephones associated with their distribution. Through my training and experience, I am familiar with the use and exploitation of cellular telephones by drug dealers and drug users. I know it is common for drug dealers to use multiple different cell phones. I also know it is common for drug dealers to use cellular phones which lack or have illegitimate subscriber information, allowing drug

dealers to conduct their illicit activities with some anonymity. Furthermore, drug dealers and drug users communicate with their co-conspirators through text messaging, voice calls and other forms of mobile messaging utilizing cellular telephones. I know that cellular telephones are an integral component in the sale/trafficking of illegal drugs.

5. Through my training and experience, I also know that distributors of illegal drugs often control or direct the location of where a meeting with a drug customer will occur. The distributor will often attempt to move the meeting location with little or no notice, frequently to attempt to avoid monitoring and detection by law enforcement. I also know that distributors of illegal drugs make frequent trips to and from supply sources, frequently located in other cities. I also know that distributors of illegal drugs often utilize a "stash" location, at which bulk drugs and/or drug proceeds are stored, separate from where drug transactions are conducted. The distributor utilizes "stash" locations to prevent law enforcement from recovering "stashed" items should the location where transactions occur be subject to search.

6. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

7. The United States, including the DEA, is conducting a criminal investigation of a Drug Trafficking Organization ("DTO") including RONALD HARRIS AKA "Rizz,"

███████████████████████████████████████

█████ ' RASHEED STOKES-JOHNSON, SHANNON STUDIVANT-BARNES, ████

3

████████████████████████ and others regarding possible violations of 21 U.S.C. §§ 846 (conspiracy to distribute controlled substances), and 841(a) (distribution of controlled substances). Multiple members of the DTO have been identified who are involved in the distribution of illegal drugs in the state of Vermont. The DTO is believed to travel between Philadelphia, PA and Chittenden County, VT, transporting bulk currency and drugs.

8.  The investigation into the DTO was initiated in October 2021, and throughout the course of the investigation 17 controlled purchases of illegal drugs have been completed as of the date of this affidavit utilizing four separate BPD Confidential Sources ("CS"). On January 12, 2023, the Grand Jury in Burlington, Vermont, returned an indictment charging four individuals in case number 2:23-CR-4 with conspiracy to distribute controlled substances and distributions of controlled substances related to the investigation. A copy of the Indictment is attached as Exhibit 1 and incorporated in this Affidavit. Pertinent facts related to the investigation are summarized below.

9.  In April of 2022, investigators interviewed a confidential source of information (CS3) who described an ongoing conspiracy to distribute narcotics and illegally obtain firearms by a group of individuals in Chittenden County, VT. CS3 described this group as obtaining narcotics in Philadelphia, PA, transporting and distributing those narcotics in Chittenden County, VT and obtaining firearms to bring back to Philadelphia, PA.

10. Working in conjunction with the ATF and DEA, the BPD developed a fourth confidential source of information (CS4) who provided corroborating information about this group. CS3 and CS4 separately identified the phone number (802) 349-0673 as the "customer" phone for individuals to call the group to obtain narcotics. CS3 and CS4 both

4

stated that the "customer" phone would be controlled by different members of the DTO, depending on who was in Vermont at the time.

11. From April to September of 2022, law enforcement conducted additional controlled purchases of narcotics from members of the group using confidential sources of information. The "customer" phone, (802) 349-0673, was used to arrange the purchases of the narcotics.

12. On September 29, 2022, law enforcement arrested a suspected member of this narcotics trafficking group in possession of narcotics and a cellular telephone bearing (802) 349-0673. Following the arrest, both CS3 and CS4 received communication from a member of the DTO (Ronald HARRIS) and obtained a replacement "customer" phone number of (641) 450-4894 for future narcotics trafficking.

13. During the months of October 2022-December 2022, three controlled purchases were conducted into the DTO and were arranged via contact with the above noted phone number, (641) 450-4894.

14. Throughout the course of the investigation, members of the DTO have utilized multiple residences in Chittenden County, VT to facilitate their drug distribution activities. The multi-apartment building located at 229 Pearl St, Essex Junction, VT was initially identified on November 9, 2022 by investigators. Surveillance on the evening of November 8, 2022 and the morning hours of November 9, 2022 identified members of the DTO apparently meeting at the Comfort Suites located at 3 Dorset St, South Burlington, VT, specifically Ronald HARRIS, Rasheed STOKES-JOHNSON, Shannon STUDIVANT-BARNES, and an unidentified male going by the nickname, "Black," were observed departing the hotel. Investigators monitored STOKES-JOHNSON, STUDIVANT-BARNES,

and "Black" travel directly to the back parking lot of the 229 Pearl St location. HARRIS was monitored via GPS location data of his cellular telephone leaving the Chittenden County, VT area and returning to Philadelphia, PA. Since November 9, 2022, the address of 229 Pearl St, Essex Junction, VT has been a consistent location utilized by the DTO. Identified members of the DTO have been observed coming and going from 229 Pearl St, and vehicles associated with the DTO have been observed parked in the parking lot of 229 Pearl St.

15.     On or about December 15, 2022, utilizing Detective Hartnett (Burlington Police Department) in an undercover capacity, the Subject Premises was determined to be associated with James MORGAN. Based on review of Valcour records, James MORGAN is the listed resident of the Subject Premises, and the Valcour records reflect that James MORGAN has used controlled substances in the past. Based on my training and experience, I know that local drug users will often allow drug traffickers to use residences in return for drugs. During the undercover operation, a male identified by Detective Hartnett as James MORGAN based on previous booking photographs answered the door to Apt C. James MORGAN is a known associate of Melinda MORGAN, who was identified through phone communication and a vehicle utilized by the DTO registered to her. This vehicle was identified as a Chevrolet Tahoe bearing Vermont temporary registration W127342, which will be discussed further within this affidavit. Detective Hartnett provided me and other investigators with a description of the layout of the interior of 229 Pearl Street.

16.     On or about December 19, 2022, investigators conducted surveillance in the area of 229 Pearl St in Essex Junction, VT. I personally have conducted surveillance in the area of 229 Pearl St in Essex Junction, VT. I know, based on my personal observations and information provided to me by Detective Hartnett, that individuals coming and going from

Apartment C of 229 Pearl St in Essex Junction, VT (i.e., the Subject Premises) are visible through an upstairs hallway window visible from the parking lot of 229 Pearl St.

17. Also on December 19, 2022, investigators completed a controlled purchase of suspected fentanyl from the DTO. The suspected fentanyl was field-tested and tested presumptively positive for fentanyl. During the controlled purchase, a male previously identified as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was observed by Detective Hartnett exiting the Subject Premises prior to the controlled purchase based on his knowledge of the layout of the building from his prior undercover operation. ▓▓▓▓ completed a controlled purchase with a Burlington PD CS in the parking lot of a building near 229 Pearl St and was then observed returning through the common entrance of 229 Pearl St.

18. Throughout the course of the investigation, the DTO's drug distribution has relied heavily on vehicles that have typically been rental vehicles or vehicles registered to other individuals. From my training and experience, I am aware that those involved in illegal activities often utilize rental vehicles and/or vehicles registered to other individuals to avoid detection by law enforcement. The vehicle of interest utilized during a controlled purchase that occurred on or about November 4, 2022, was the previously noted Chevrolet Tahoe bearing Vermont temporary registration W127342, registered to Melinda MORGAN. In addition, ▓▓▓▓ was operating the Chevrolet Tahoe on December 19, 2022; he parked the Chevrolet Tahoe in the parking lot of 229 Pearl St prior to the controlled purchase.

19. During the week of January 8, 2023, investigators noted that the Tahoe was parked in the rear parking lot of the Subject Premises and remained stationary in that

7

location. It was later determined that the vehicle had a flat tire. The Tahoe has been parked within the back lot with the flat tire since that time up to the date of this affidavit.

20. On January 11, 2023, Detective Vivori observed a silver Audi station wagon bearing Vermont temporary registration W133375 leave the rear parking lot of 229 Pearl St. Detective Vivori observed a male he recognized as Shannon STUDIVANT-BARNES AKA "Whitey" and a second unidentified male in the vehicle. STUDIVANT-BARNES had previously been identified as a member of the DTO. Detective Vivori continued to conduct surveillance as the Audi traveled into Burlington, VT and then began to be involved in short duration meetings with pedestrians on foot. This conduct is consistent with my observations of this DTO throughout the investigation in which customers enter a vehicle operated by a member of the DTO to purchase drugs; several controlled purchases are also consistent with this conduct. Detective Vivori noted that the Audi did not need to make any stops prior to being engaged in suspected drug activity in Burlington.

21. The Audi has been observed parked in the rear parking area of 229 Pearl St during the morning hours of January 12th, January 13th, January 16th, and January 17th of 2023. It should be noted that investigators were not able to check the address every morning, so it is unknown if the Audi was parked there on other occasions. On the morning of January 13, 2023, Detective Vivori again observed STUDIVANT-BARNES and an unknown male depart the common entrance of 229 Pearl St and access the Audi before departing the area.

22. As of the date of this affidavit, both 229 Pearl St and, specifically, the Subject Premises, have continued to be frequented by the DTO since investigators first identified the address on November 9, 2022. This has been verified utilizing investigator surveillance, a Vermont state warrant for GPS tracking device affixed to the previously noted Chevrolet

Tahoe associated with the DTO registered to Melinda MORGAN, and GPS location data associated with DTO member ▮▮▮▮▮'s cellular phone indicating that ▮▮▮▮▮ was in the general area of 229 Pearl St.

23. On January 17, 2023, at approximately 11:30 a.m., I was monitoring GPS location data associated with HARRIS's cell phone, authorized by a federal search warrant granted by the Hon. Kevin J. Doyle, United States Magistrate Judge. The GPS location data suggested that HARRIS's cell phone was traveling northbound from the area of Philadelphia, PA. Based on prior investigation into HARRIS, I am aware that his associate, believed to be his sister, Ronette HARRIS, had previously rented multiple vehicles from Avis for Ronald HARRIS to travel to Vermont. I contacted Avis and learned that Ronette HARRIS had a current rental vehicle, described as a silver Honda Accord with Virginia registration UCG8794. I previously observed Ronald HARRIS operating this vehicle in Vermont on January 3, 2023.

24. On January 17, 2023, at approximately 5:30 p.m., I located the silver Honda Accord on Shelburne Road near the intersection with I-189. Investigators maintained surveillance of the vehicle as it traveled to Colchester, VT where it made a brief stop before it proceeded to 229 Pearl St in Essex Junction, VT where it parked in the parking lot.

25. At approximately 6:12 p.m. on January 17, 2023, Detective Vivori observed a male consistent with HARRIS's appearance exit the driver's seat and a second male exit the front passenger seat. The males accessed the trunk and removed at least one bag. The males then entered the common entrance of 229 Pearl St and were then observed through the window entering the door of Apartment C. A short time later, a male consistent with

HARRIS's appearance exited 229 Pearl St. The male consistent with HARRIS's appearance did not appear to have any bags with him when he returned to the silver Honda Accord.

### TRAINING AND EXPERIENCE

26. Based on my training and experience, I also know the following:

    a. Persons who participate in the distribution of controlled substances frequently use multiple cellular telephones, among other communications devices, to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal drugs.

    b. Information stored in the memories of these communication devices constitutes evidence of drug trafficking. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, messages received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. The device may also contain GPS or similar location information indicating where the devices have traveled.

    c. With their cellular phones, drug dealers often take photographs or videos of drugs, drug paraphernalia, guns, other members of their organizations, cash and assets obtained from profits of drug sales, and locations associated with their illegal activity. These photographs or videos may be stored in the memory of those cellular phones.

    d. Distributors of controlled substances often carry firearms to protect both their product as well as any profits they may obtain from their distribution activities. I have participated in investigations (related to the distribution of controlled substances) in which evidence of unlawful purchases and possession of firearms have been found in the data stored in cellular telephones, including photos stored in the cellular telephone memory – some of which

have depicted firearms or individuals possessing firearms – text messages or calls to arrange the purchase of a firearm, or contact with a seller of a firearm through an online advertisement. Often, the same cellular telephones contain evidence related to the distribution of controlled substances, including photographs of controlled substances and bulk United States currency.

## INFORMATION REGARDING ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Subject Devices were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the Subject Devices because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

11

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic device was used, the purpose of its use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Subject Devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant. It may be necessary to conduct the examination with forensic equipment outside the District of Vermont.

## CONCLUSION

30. Based on the foregoing, I submit there is probable cause to search the Subject Premises, specifically described in Attachment A, for the evidence, contraband, and property for use in crimes described in Attachment B of the Application.

31. I further request that the Court authorize execution of this search warrant at any time during the day or night, for good cause shown. Specifically, agents intend to attempt to arrest HARRIS in the near future, including during nighttime hours. Because HARRIS's arrest could alert other members of the DTO to the investigation and lead to the destruction or concealment of evidence (such as controlled substances or U.S. currency), or the flight of other members of the DTO or others, executing this warrant as soon as possible after HARRIS's arrest would increase the likelihood of seizing contraband and locating those involved in criminal conduct. Delay in executing this warrant would impede law enforcement's ability to seize evidence and locate involved individuals.

Dated at Burlington, in the District of Vermont, this 17th day of January 2023.

_____
Philip Tremblay
DEA TFO

Sworn to and subscribed before me this 17th day of January 2023.

_____
HONORABLE KEVIN J. DOYLE
United States Magistrate Judge